IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  14-cv-01304-LTB-MJW

CHARLES MATTHYS, a Texas citizen;
TYLER MATTHYS, a Texas citizen; and
LINDA PHILLIPS, a New Mexico citizen,

        Plaintiffs,

v.

NARCONON FRESH START, d/b/a A LIFE WORTH SAVING, INC.;
ASSOCIATION FOR BETTER LIVING AND EDUCATION INTERNATIONAL; and
NARCONON INTERNATIONAL,

        Defendants.

_____

## MEMORANDUM OPINION AND ORDER

_____

**Babcock, J.**

      This matter comes before me on three motions to dismiss.  Docs. # 25, 28, 29.  I have reviewed the motions and all related pleadings and exhibits.  Oral argument would not materially assist me in deciding the motions.  As I explain below, I **DENY** the motions of defendants Association for Better Living and Education International ("ABLE") and Narconon International ("NI") seeking dismissal of all claims for lack of personal jurisdiction [Doc. # 28] and for failure to state a claim of alter ego liability [Doc. # 29].   ABLE, NI, and the other defendant, Narconon Fresh Start, d/b/a A Life Worth Saving, Inc. ("Fresh Start") (collectively, "Defendants") have also filed a motion [Doc. # 25] arguing that Charles Matthys, Tyler Matthys, and Linda Phillips ("Plaintiffs") have failed to state a claim with respect to certain counts in their complaint. I **GRANT**

**IN PART AND DENY IN PART** that motion and I **DISMISS** Linda Phillips' contract claim,

Plaintiffs' negligent infliction of emotional distress claim, and Plaintiffs' RICO claim.

## I. Background

The facts in this section are drawn from Plaintiffs' complaint.  In February 2014, Charles

Matthys was searching for a substance abuse treatment program for his son, Tyler Matthys. 1st

Am Compl. ¶ 12 [Doc. # 16].  Charles spoke with employees of Fresh Start, who convinced him

to send Tyler to a Fresh Start facility in Fort Collins, Colorado.  *Id.* ¶ 13.  Fresh Start uses the

"Narconon" treatment program.  *Id.* ¶ 14.

The Fresh Start employees told Charles that the Narconon program has a 75% "success

rate"; that Narconon's "New Life Detoxification sauna program" would "eliminate Tyler's drug

cravings by making him sweat out residual drug toxins in his cells"; that Fresh Start would

provide Tyler "extensive drug and addiction counseling from duly qualified professionals"; that

Tyler would "be under the care of a doctor or nurse"; and that Tyler's health insurance would

cover at least 50% of the cost of the program.  *Id.* ¶¶ 15, 54.  The Fresh Start employees directed

Charles to the Narconon website, which made similar claims.  *Id.* ¶ 16.  In addition, Fresh Start's

representatives and website represented to Charles "that religion is not part of the Narconon

treatment program."  *Id.* ¶ 17.

Charles "agreed to send [Tyler] to Fresh Start" "[b]ased on these representations."  *Id.*

¶ 18.  Fresh Start charged a "$31,000 fee," which Charles, together with Tyler's grandmother,

Linda Phillips, paid with funds Charles and Linda borrowed from Linda's bank.  *Id.* ¶ 19.  Tyler

entered Fresh Start on or about February 20, 2014.  *Id.* ¶ 18.  Tyler left Fresh Start on April 2,

2014, "because he was not receiving substance abuse counseling and he did not feel safe." *Id.* ¶ 40.

On May 8, 2014, Charles, Tyler, and Linda brought this lawsuit, in which they allege that Tyler did not receive the secular substance abuse treatment that Fresh Start promised. Plaintiffs allege that Tyler's treatment consisted of reading the works of L. Ron Hubbard, the founder of the Scientology religion, regarding Scientology doctrines and concepts. *Id.* ¶¶ 21-22. They allege that treatment is "used to recruit patients into the Church of Scientology." *Id.* ¶ 35. In addition, Plaintiffs contend that "at no point did Narconon staff ever speak to Tyler about the specifics of his life or his drug use and its causes." *Id.* ¶ 37. Plaintiffs allege there were no qualified counselors and no doctors, nurses, or other medical professionals on site, and that treatment was provided by former Fresh Start patients. *Id.* ¶ 20. While a sauna program was offered, Plaintiffs allege it was not "scientifically and medically proven as effective," as advertised. *Id.* ¶ 31. Rather, Plaintiffs say it poses health risks in that it requires "sitting in extreme temperatures for hours" and "ingest[ing] extreme doses of Niacin and other vitamins." *Id.* ¶ 29. Plaintiffs also allege they were misled by Fresh Start's claims that the program has a 75% success rate and that Tyler's health insurance would pay 50% of the program's fee. *Id.* ¶¶ 34, 39.

Plaintiffs bring the following claims against Fresh Start, ABLE, and NI: (1) breach of contract; (2) fraud; (3) fraudulent concealment; (4) negligence; (5) intentional infliction of emotional distress; (6) negligent misrepresentation; (7) violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6–1–101, *et seq.* ("CCPA"); (8) violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); (9) unjust

enrichment; and (10) negligent infliction of emotional distress.  1st Am. Compl. ¶¶ 48-101 [Doc. # 16].  Plaintiffs allege that Fresh Start is liable on each count based on its own conduct.  Plaintiffs allege that ABLE and NI are liable for Fresh Start's conduct because Fresh Start was their alter ego.  *Id.* ¶¶ 42-47.  Plaintiffs allege Fresh Start and NI are subsidiaries of ABLE, which "oversees the drug rehabilitation, education, and criminal justice activities of the Church of Scientology."  *Id.* ¶ 6.

In the instant motions, ABLE and NI—both California-incorporated and -headquartered corporations, *id.* ¶¶ 3, 7—contend that the Court does not have personal jurisdiction over them because they do not have sufficient minimum contacts with Colorado.  Fed. R. Civ. P. 12(b)(2).  ABLE and NI also contend that all of Plaintiffs claims fail because Plaintiffs fail to state an alter ego claim against them.  Fed. R. Civ. P. 12(b)(6).  Finally, all three Defendants argue that Plaintiffs have failed to state their breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, CCPA, and RICO claims and, therefore, that those claims must be dismissed.  *Id.*  I address Defendants' motions in turn.

## II.  Motion to Dismiss ABLE and NI for Lack of Personal Jurisdiction [Doc. # 28]

### A.  Standard of Review

A defendant may move to dismiss a complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  When a defendant does so, the plaintiff has the burden of establishing that the court has personal jurisdiction over the defendant.  *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999).  Where the court does not conduct an evidentiary hearing, as here, "the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion."  *Id.* (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of*

*Canada*, 149 F.3d 1086, 1090 (10th Cir. 1998)). The court takes the well-pled allegations of the complaint as true to the extent they are uncontroverted by the defendant's affidavits or other written materials. *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990). Where the parties' written materials are in conflict, the court resolves all factual disputes in the plaintiff's favor, "and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation" by the defendant. *Id.*

Federal courts sitting in diversity—which is the only basis for subject matter jurisdiction alleged here, *see* 1st Am. Compl. ¶ 10 [Doc. # 16]—may only exercise personal jurisdiction over a nonresident defendant where both state law and federal due process are satisfied. *See, e.g., Doering v. Copper Mountain, Inc.*, 259 F.3d 1202, 1209-10 (10th Cir. 2001); *Taylor*, 912 F.2d at 431. "Colorado's long arm statute is coextensive with constitutional limitations imposed by the due process clause. Therefore, if jurisdiction is consistent with the due process clause, Colorado's long arm statute authorizes jurisdiction over a nonresident defendant." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004); *accord Keefe v. Kirschenbaum & Kirschenbaum, P.C.*, 40 P.3d 1267, 1270 (Colo. 2002) (citing Colo. Rev. Stat. §§ 13–1–124(1)(a)–(b)). So the relevant inquiry here is whether exercising personal jurisdiction over ABLE and NI comports with due process, a question of federal law. *Nat'l Bus. Brokers, Ltd. v. Jim Williamson Prods., Inc.,* 115 F. Supp. 2d 1250, 1253 (D. Colo. 2000) ("Federal law, not state law, guides the due process analysis."), *aff'd,* 16 F. App'x 959 (10th Cir. 2001).

"The Supreme Court has held that, to exercise jurisdiction in harmony with due process, defendants must have 'minimum contacts' with the forum state, such that having to defend a lawsuit there would not 'offend traditional notions of fair play and substantial justice.'"

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) (quoting

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Personal jurisdiction may be either

general or specific.  The exercise of general personal jurisdiction comports with due process

where the corporation's "affiliations with the State are so continuous and systematic as to render

it essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014)

(internal quotations, citation, and alteration omitted).  Specific personal jurisdiction, by contrast,

is "jurisdiction specific to this dispute." *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir.

2013).  To determine whether the exercise of specific personal jurisdiction comports with due

process, the court asks "(1) whether the defendant purposefully directed its activities at residents

of the forum state; (2) whether the plaintiff's injury arose from those purposefully directed

activities; and (3) whether exercising jurisdiction would offend traditional notions of fair play

and substantial justice." *Id.*

**B.  Analysis**

Plaintiffs' primary argument is that the Court has specific personal jurisdiction over

ABLE and NI by virtue of their involvement with Fresh Start, over which the Court undisputedly

has jurisdiction.  I begin with Plaintiffs' complaint.  Plaintiffs allege that ABLE "controls the

time, manner and method of NI's and Fresh Start's businesses by actively managing their daily

operations, including conducting inspections of Narconon centers and creating, licensing, and

approving their marketing materials."  1st Am. Compl. ¶ 8 [Doc. # 16].  Similarly, Plaintiffs

allege that NI "exercises control over the time, manner, and method of Fresh Start's operations."

*Id.* ¶ 4.  According to Plaintiffs, the three companies have "such unity of interest and

ownership . . . that they are inseparable from one another," and their separate corporate

existences are a "scheme to perpetrate a fraud," carried out to make money and "promote the Scientology religion." *Id.* ¶¶ 45-46.

In support of these allegations, Plaintiffs rely, among other things, upon the affidavit of Eric Tenorio, a former employee of "five different Narconon centers," although not of Fresh Start itself. Tenorio Aff. ¶ 2 [Doc. # 37-1]. ABLE and NI argue that Mr. Tenorio's affidavit lacks foundation and is not relevant because Mr. Tenorio worked at Narconon facilities other than Fresh Start. I disagree. Mr. Tenorio's observations are based on his experience working in multiple Narconon centers across the country, including as an "Executive Director" at one facility, which is the "highest position at a Narconon Center." *Id.* In addition, Mr. Tenorio frames his observations in general terms, referring to "Narconon centers" rather than the particular centers at which he worked. *See, e.g., id.* ¶ 7. Therefore, I am comfortable concluding that the affidavit has a proper foundation and is relevant to understanding Fresh Start's relationship to ABLE and NI. My conclusion might be different if Mr. Tenorio's observations were based on having worked at only a single Narconon center.

Mr. Tenorio worked at the five Narconon centers for a total of more than twelve years. *Id.* ¶ 2. Mr. Tenorio states that both "Narconon International and ABLE have had the ultimate authority over every center in which I have worked." *Id.* ¶ 17. ABLE and NI, he says, send personnel to "supervise and monitor the delivery [of] the 'rehabilitative technology' at individual Narconon centers." *Id.* ¶ 7. They "must approve all websites an individual Narconon center uses." *Id.* ¶ 8. Further, they advise centers on how to handle legal matters and bad publicity. *Id.* ¶ 12. Mr. Tenorio also identifies additional ways in which NI (though not ABLE) controls Narconon centers: by exercising "ultimate authority over the hiring and firing of staff members"

at centers, *id.* ¶ 5; by investigating misconduct by employees and "tak[ing] disciplinary actions" against them, *id.* ¶ 6; by requiring centers to advertise the benefits of the sauna program, *id.* ¶ 10; and by requiring centers to provide NI with detailed financial reporting on a weekly basis, *id.* ¶ 11.

Plaintiffs have also submitted dozens of pages from NI's website that advertise drug rehabilitation services in Colorado and, specifically, the Fresh Start facility where Tyler Matthys received treatment. Exs. E & F to Resp. [Docs. # 37-5, 37-6]. For example, one page contains a "Narconon International" logo, the heading "Narconon Colorado-Drug Rehab Fort Collins," and photos and a detailed description of the Fort Collins facility. Ex. E to Resp. at 3 [Doc. # 37-5]. The page states, "Don't Wait to Get Help," and provides a toll-free phone number to call to "[s]peak to a professional counselor now" as well as a "contact form" into which the user can input his contact information. *Id.* at 3, 5. The page touts the "excellence of the rehabilitation program" at Fresh Start (which it calls "Narconon Colorado"), and notes that "Narconon Colorado offers a family the comfort of a guarantee of sobriety." *Id.* at 3-4. The page notes that "[t]his is where people from all over the state and neighboring states come to find lasting relief from addiction to heroin, methamphetamine, marijuana, alcohol and other drugs." *Id.* at 3.

ABLE and NI have submitted the declarations of a vice president of ABLE and the president of NI. Qureshi Decl. [Doc. # 28-1]; Carr Decl. [Doc. # 28-2]. These declarations contradict some of the statements in Mr. Tenorio's affidavit regarding the relationship between ABLE, NI, and Fresh Start. For example, the declarations state that ABLE and NI do not "control or have the right to control the hiring or firing of Fresh Start's employees or staff." Qureshi Decl. ¶ 12 [Doc. # 28-1]; Carr Decl. ¶ 12 [Doc. # 28-2]. In other regards, the

declarations do not directly contradict Mr. Tenorio's affidavit.  For example, they state that

ABLE and NI do not control or have the right to control the "day to day treatment" of Fresh Start

students, but they do not address whether ABLE and NI nonetheless "supervise and monitor the

delivery [of] the 'rehabilitative technology' at individual Narconon centers."  *Id.*; Tenorio Aff.

¶ 7 [Doc. # 37-1].  In any event, I am required to resolve conflicts in the parties' submissions in

favor of Plaintiffs.  *See Taylor*, 912 F.2d at 431.  Therefore, to the extent ABLE and NI's

declarations contradict Mr. Tenorio's affidavit, I accept the statements in Mr. Tenorio's affidavit

as true.

Applying the three-part test outlined above, I conclude that the Court has specific

personal jurisdiction over ABLE and NI.  First, ABLE and NI purposefully directed their

activities at residents of Colorado.  Even accepting ABLE and NI's contention that there are no

parent/subsidiary relationships among ABLE, NI, and Fresh Start—but, rather, that their

relationship is solely that of licensor, licensee, and sublicensee of the Narconon trademarks and

service marks, respectively—Mr. Tenorio's affidavit establishes that ABLE and NI maintain a

high degree of control over the operations of the treatment facilities to which they license those

marks, including Fresh Start in Colorado.  NI's website bolsters Plaintiffs' showing that NI

purposefully directed its activities at Colorado.  In contrast with a "passive Web site that does

little more than make information available to those who are interested," wherever they might

be, *Soma*, 196 F.3d at 1297, NI's website specifically advertises the Fresh Start facility in

Colorado; touts it as a place where "people from all over the state" obtain treatment; and invites

visitors to call Fresh Start or leave their contact information.

ABLE and NI argue that licensors "are generally not subject to personal jurisdiction where their sole contact with the forum state is a licensee."  Reply at 5 [Doc. # 45] (citing *Quigley v. Guvera IP Pty. Ltd.,* 2010 U.S. Dist. LEXIS 134409, at *15-16 (N.D. Cal. Dec. 20, 2010)).  ABLE and NI focus on the situation in which the licensor merely receives royalty income from sales made by the licensee in the forum state.  But where the licensor takes a more active role in the licensee's business, personal jurisdiction may lie.  *See Hydraulics Unlimited Mfg. Co. v. B/J Mfg. Co.,* 323 F. Supp. 996, 999 (D. Colo. 1971) (noting that while royalty payments alone did not constitute sufficient minimum contacts, "other factors, such as extended negotiations, the defendants' presence, or substantial and related business activity in Colorado" could point to a "different conclusion"), *aff'd,* 449 F.2d 775 (10th Cir. 1971); *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1366 (Fed. Cir. 2006) (in patent context, where defendant does more than merely "recei[ve] royalty income" from a licensee in the forum state, such as "exercise control over the licensees' sales activities," defendant may be subject to personal jurisdiction in forum state).  Based on the evidence discussed above, I am satisfied that the licensing relationship among ABLE, NI, and Fresh Start is of the more involved sort that demonstrates purposefully directed activity by ABLE and NI.

Second, Plaintiffs' alleged injuries arose from ABLE and NI's purposefully directed activities—namely, their involvement with Fresh Start's operations in Colorado.  For example, Mr. Tenorio's affidavit indicates that ABLE and NI supervise and monitor Narconon facilities' delivery of rehabilitative programming.  Plaintiffs' claims are based on the ways in which that programming allegedly differed from the programming Plaintiffs were promised.  Further, Mr. Tenorio's affidavit indicates that ABLE and NI approve websites used by Narconon centers.

1of 23

Some of Plaintiffs' claims are based on allegedly misleading claims contained on Fresh Start's website. *See, e.g.,* 1st Am. Compl. ¶ 82 [Doc. # 16] (noting that "Defendants make numerous false claims about their treatment program to the public at large on their website at www.narcononcolorado.org"). Finally, exercising personal jurisdiction over ABLE and NI would not offend traditional notions of fair play and substantial justice. ABLE and NI's alleged extensive control over Fresh Start's operations in Colorado put them on notice that they could be subject to suit here.

For these reasons, I conclude that the Court has personal jurisdiction over ABLE and NI. I note that another court recently concluded that it had personal jurisdiction over ABLE and NI when confronted with similar allegations. *See Geanacopulos v. Narconon Fresh Start*, 39 F. Supp. 3d 1127, 1131-33 (D. Nev. 2014).

### III. Motions to Dismiss for Failure to State a Claim [Docs. # 25, 29]

**A. Standard of Review**

A court may dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations omitted). To survive a motion to dismiss, a plaintiff must plead "factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

In deciding a defendant's motion to dismiss under Rule 12(b)(6), a court assumes that all of the plaintiff's well-pleaded factual allegations are true and views them in the light most favorable to the plaintiff.  *Iqbal*, 556 U.S. at 679; *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).  By contrast, the court does not accept legal conclusions as true.  *Khalik v. United Airlines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Iqbal*, 556 U.S. at 677).  "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will disregard conclusory statements [of law] and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable.  *Khalik*, 671 F.3d at 1191.

## B. Analysis

### 1. Alter Ego Claim Against ABLE and NI

I apply Colorado law in determining whether the criteria for alter ego liability are met because subject matter jurisdiction in this matter is founded on diversity of citizenship. 28 U.S.C. § 1332(a); 1st Am. Compl. ¶ 10 [Doc. # 16]; *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995).  Under Colorado law, "[p]iercing the corporate veil is an equitable remedy, requiring balancing of the equities in each particular case."  *Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC*, 37 P.3d 485, 490 (Colo. App. 2001) (citation omitted).  "The corporate entity may be disregarded, and [the] corporate veil may be pierced, if not doing so would defeat public convenience, justify wrong, or protect fraud."  *Id.*  In determining whether it is appropriate to pierce the corporate veil, the court "may consider certain factors, not all of which must be shown," including:

(1) The parent corporation owns all or [a] majority of the capital stock of the subsidiary. (2) The parent and subsidiary corporations have common directors or officers. (3) The parent corporation finances the subsidiary. (4) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation. (5) The subsidiary has grossly inadequate capital. (6) The parent corporation pays the salaries or expenses or losses of the subsidiary. (7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation. (8) In the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division. (9) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation. (10) The formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*Id.; accord Skidmore, Owings & Merrill v. Canada Life Assur. Co.*, 907 F.2d 1026, 1027 (10th Cir. 1990).

In their complaint, Plaintiffs allege that Fresh Start and NI are subsidiaries of ABLE and, further, that NI is the parent company of Fresh Start.  1st Am. Compl. ¶¶ 4, 6 [Doc. # 16]. Plaintiffs allege that ABLE, which "oversees the . . . drug rehabilitation activities of the Church of Scientology," "heavily influences Narconon Fresh Start and NI and governs and controls nearly every aspect of their business activities." *Id.* ¶¶ 6, 44.  Plaintiffs state that ABLE "actively manag[es]" Fresh Start's "daily operations, including conducting inspections of Narconon centers and creating, licensing, and approving their marketing materials." *Id.* ¶ 8. Plaintiffs allege that Fresh Start and NI are "mere instrumentalities" of ABLE and that the three companies have "such unity of interest and ownership . . . that they are inseparable from one another." *Id.* ¶¶ 43, 45.

The companies' separate corporate existences, Plaintiffs allege, are part of a "scheme to fraudulently induce patients to enroll in one of their treatment facilities" in order to obtain patients' money and to "recruit for and promote the Scientology religion." *Id.* ¶ 46. Plaintiffs allege that Defendants "prey[ed] on Plaintiffs' vulnerabilities and attempt[ed] to recruit Tyler Matthys into Scientology under the guise of providing drug treatment." *Id.* ¶ 69. In the same vein, Plaintiffs allege that Defendants operate a website advertising Fresh Start as a "drug rehab program" even though patients "receive nothing but Scientology doctrine and dangerous Scientology rituals" that are "not even related to substance abuse or addiction." *Id.* ¶ 84.

These allegations suggest the potential presence of at least some of the factors courts consider in determining whether to pierce the corporate veil, notably that "[t]he directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation" and that "[t]he parent corporation owns all or [a] majority of the capital stock of the subsidiary." *Great Neck Plaza*, 37 P.3d at 490. Further, Plaintiffs' allegation that Defendants have abused their separate corporate existences to carry out a fraud suggests an additional equitable reason for disregarding the corporate form. *See id.* (piercing the corporate veil is an "equitable remedy" and is appropriate where recognizing the corporate form would serve to "protect fraud"). For these reasons, I conclude that Plaintiffs have demonstrated that they have a plausible alter ego claim and should be afforded the opportunity to obtain discovery to determine the viability of that claim. *See Khalik*, 671 F.3d at 1191 (on Rule 12(b)(6) motion, court considers whether allegations "plausibly suggest the defendant is liable"); *Geanacopulos*, 39 F. Supp. 3d at 1127 (materially identical allegations precluded Rule 12(b)(6)

dismissal of alter ego claim against ABLE and NI because allegations made it "plausible that plaintiffs could show an alter ego . . . relationship").

I note that Plaintiffs raised additional theories for maintaining claims against ABLE and NI in their response brief—namely, that ABLE and NI are liable for Fresh Start's acts because Fresh Start acted as their agent, and that ABLE and NI are liable for their own misconduct, independent of Fresh Start's conduct. ABLE and NI addressed only the alter ego theory in their motion to dismiss. Having concluded that Plaintiffs' allegations state an alter ego theory, I do not address whether they might be construed to state these additional theories.

### 2. Breach of Contract Claim Against All Defendants

As a threshold matter, Defendants argue that Tyler Matthys and Linda Phillips do not have standing to bring a breach of contract claim. Plaintiffs allege that "Defendants contracted with Charles Matthys to provide Tyler Matthys secular drug and alcohol treatment." 1st Am. Compl. ¶ 49 [Doc. # 16]. Thus, Plaintiffs allege that only Charles had a contract with Defendants. Colorado law recognizes that a non-party may sue for breach of a contract "intended to benefit the non-party" in a "direct"—though not "incidental"—manner where that intent is "apparent from the terms of the agreement, the surrounding circumstances, or both." *E.B. Roberts Const. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo. 1985); *accord Harwig v. Downey*, 56 P.3d 1220, 1221 (Colo. App. 2002). As is apparent from the circumstances alleged in the complaint, the main purpose of the contract between Charles and Fresh Start was to benefit Tyler. Accordingly, Tyler has standing to sue for breach of contract. *See Mott v. Narconon Fresh Start*, No. 14-CV-01293-PAB-KMT, 2015 WL 1259277, at *4 (D. Colo. Mar. 17, 2015) (concluding on similar facts that third party had standing to sue for breach

of contract where "the sole purpose of the agreement . . . was to provide substance abuse treatment").

No basis, however, has been alleged for Linda Phillips' standing.  Plaintiffs have alleged that she borrowed funds that she then used to pay for Tyler's treatment.  1st Am. Compl. ¶ 50 [Doc. # 16].  Plaintiffs, however, have not identified any legal theory that allows Ms. Phillips to sue for breach of a contract to which she was not a party and from which she was not intended to directly benefit.  Accordingly, I will dismiss the breach of contract claim as to Ms. Phillips.

Defendants also argue that Plaintiffs' allegations with respect to certain elements of their breach of contract claim are vague and conclusory.  Under Colorado law, a breach of contract claim has four elements: "(1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff."  *Contrada, Inc. v. Parsley*, No. 10-cv-00646-WYD-CBS, 2012 WL 573918, at *2 (D. Colo. Feb. 22, 2012) (citing *Western Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992)).  Specifically, Defendants take issue with Plaintiffs' allegations regarding the first and third elements: existence of a contract and failure to perform.  As noted, Plaintiffs allege that Defendants "contracted with Charles Matthys to provide Tyler Matthys secular drug and alcohol treatment."  1st Am. Compl. ¶ 49 [Doc. # 16].  Plaintiffs allege that Defendants "breached this contract by, *inter alia*, (i) failing to provide services constituting drug and alcohol treatment; and (ii) providing Scientology in lieu of drug and alcohol treatment."  *Id.* ¶ 51.  These allegations, among other relevant allegations in the complaint, contain sufficient factual detail to make it plausible that a contract exists and that Defendants did not perform that contract in the respects identified.  *Khalik*, 671 F.3d at 1191.  Accordingly, I decline to dismiss

the breach of contract claim as to Tyler or Charles. *See Mott*, 2015 WL 1259277, at *3-4 (rejecting similar arguments).

### 3. Intentional Infliction of Emotional Distress Claim Against All Defendants

To prevail on a claim for intentional inflection of emotional distress, also known as a claim for outrageous conduct, a plaintiff must show that (1) the defendant engaged in extreme and outrageous conduct; (2) recklessly or with the intent of causing the plaintiff severe emotional distress; (3) causing the plaintiff severe emotional distress. *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003). With regard to the first element, the court must determine as a matter of law whether "reasonable persons could differ on whether the defendant's conduct was sufficiently outrageous" before submitting the claim to the jury. *Id.* Defendants' arguments focus on this element.

Plaintiffs allege Defendants' conduct is outrageous because Defendants "prey[ed] on Plaintiffs' vulnerabilities and attempt[ed] to recruit Tyler Matthys into Scientology under the guise of providing drug treatment." 1st Am. Compl. ¶ 69 [Doc. # 16]. Defendants correctly note that outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999). However, as Plaintiffs note, "conduct, otherwise permissible, may become extreme and outrageous if it is an abuse by the actor of a position in which he or she has actual or apparent authority over the other, or the power to affect the other's interests." *Pearson*, 70 P.3d at 598 (citing *Farmers Group, Inc. v. Trimble*, 659 P.3d 1370, 1377 (Colo. App. 1982)) (brackets omitted). Further, conduct may be outrageous where an actor knows that the other is "peculiarly

susceptible to emotional distress by reason of some physical or mental condition or peculiarity."
*Zainis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo. App. 1982).

Based on these standards, a reasonable person could conclude that Defendants' alleged conduct was extreme and outrageous. *See Tarr v. Narconon Fresh Start*, No. 2:14-CV-0283-GMN-NJK, 2014 WL 6908487, at *4 (D. Nev. Dec. 8, 2014) ("[T]he Court finds that a reasonable person could certainly conclude that it was outside all possible bounds of decency for Narconon to attempt to indoctrinate Michael Tarr into the Church of Scientology in lieu of helping him overcome his heroin addiction.") (quotations omitted). I reach this conclusion for several reasons. First, it is alleged that Fresh Start billed itself to Tyler and his family as a secular substance abuse rehabilitation program. 1st Am. Compl. ¶¶ 38, 69 [Doc. # 16]. Yet Plaintiffs allege the program was not secular and did not address Tyler's substance abuse issues. This is markedly different than a situation in which the patient knows he is entering a faith-based rehabilitation program, or even a situation in which a patient does not know, but the program nonetheless treats his substance abuse issues. Second, Tyler was allegedly suffering with addiction and, therefore, it can reasonably be inferred that he was particularly susceptible to emotional distress. *See Zainis*, 645 P.2d at 294. Third, because Fresh Start purported to provide medical treatment to Tyler in an apparently inpatient setting, Fresh Start arguably was in a position of some authority over Tyler, even though he may have been technically free to leave. *See Pearson*, 70 P.3d at 598.

To the extent Defendants also argue that there are inadequate allegations of intentional or reckless conduct on the part of the Defendants, I find that the complaint contains numerous allegations from which intentional conduct can be inferred. *See, e.g.,* 1st Am. Compl. ¶ 54 [Doc.

18

# 16] (alleging various "false misrepresentations Defendants knowingly made to the Plaintiffs," including that "Tyler Matthys would receive counseling related to substance abuse at Fresh Start"). For these reasons, I will deny the motion to dismiss as to this claim.

### 4. Negligent Infliction of Emotional Distress Claim Against All Defendants

To make out a negligent infliction of emotional distress claim, "a plaintiff must show that the defendant's negligence created an unreasonable risk of physical harm and caused the plaintiff to be put in fear for his or her own safety, that this fear had physical consequences or resulted in long-continued emotional disturbance, and that the plaintiff's fear was the cause of the damages sought." *Draper v. DeFrenchi-Gordineer*, 282 P.3d 489, 496-97 (Colo. App. 2011). The plaintiff must show that any physical injury or long-continued emotional disturbance "was caused by her fear for her own safety." *Scharrel v. Wal-Mart Stores, Inc.*, 949 P.2d 89, 93 (Colo. App. 1997). Defendants argue that Plaintiffs have not made adequate allegations in this regard. I agree. As the basis of their claim, Plaintiffs allege that Tyler "suffered severe emotional distress" as a result of Defendants' "subject[ing] him to unreasonable risks of bodily harm by . . . having Tyler spend several hours per day in a sauna for five weeks while ingesting extreme doses of Niacin without medical supervision." 1st Am. Compl. ¶¶ 100-01 [Doc. # 16]. While Plaintiffs allege that Tyler has suffered severe emotional distress, Plaintiffs allege no facts from which it can be inferred that Tyler feared for his safety while he participated in the sauna program, or that such fear, rather than other things, caused his emotional distress. Accordingly, this aspect of Defendants' motion to dismiss is granted. *Mott*, 2015 WL 1259277, at *5 (reaching same conclusion on similar facts).

### 5. CCPA Claim Against All Defendants

A plaintiff bringing a private claim for relief under the CCPA must show: "(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury." *Crowe v. Tull*, 126 P.3d 196, 201 (Colo. 2006). Defendants make arguments as to the third and fifth elements.

With regard to the third element—significant impact to the public—Defendants argue that Fresh Start's alleged misrepresentations do not significantly impact the public because they were not "directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers." Mot. at 7 [Doc. # 25] (quoting *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)). This argument is not persuasive. To be sure, Plaintiffs have alleged certain statements made directly to Charles Matthys by Fresh Start representatives. *See, e.g.,* 1st Am. Compl. ¶¶ 13, 15 [Doc. # 16] (alleging "Fresh Start employees Bryan Randall and Matt Kinser" told Charles "that Narconon's sauna program would eliminate Tyler's drug cravings by making him sweat out residual drug toxins in his cells"). Such statements, by themselves, are not actionable under the CCPA. *See Hall*, 969 P.2d at 235 (CCPA cannot be used to redress a "purely private wrong"). But Plaintiffs also allege misrepresentations that are "directed to the market generally," *id.*, such as claims on the "Narconon Fresh Start website" to "the public at large" that Fresh Start has a 76% "success rate" and that "Tyler Matthys would

20

receive counseling related to substance abuse at Narconon." 1st Am. Compl ¶¶ 16, 79 [Doc. # 16]. These allegations are sufficient to demonstrate a significant public impact under the CCPA.

I am not persuaded by Defendants' argument that "a single website [that] contains misrepresentations is insufficient to allege a significant public impact" because "the website is likely to be perused only by people actively seeking out Narconon treatment." Reply at 6 [Doc. # 44]. The audience of any website advertising a product or service is likely to be visited primarily or only by those considering purchasing the product or service. This does not preclude a claim of public impact. As noted above, the CCPA is concerned with the impact to "the public *as actual or potential consumers* of the defendant's goods, services, or property." *Crowe*, 126 P.3d at 201 (emphasis added). For example, a plaintiff who operated "gift and jewelry shows" was permitted to maintain a CCPA claim against a competitor who "informed [plaintiff's] exhibitors and buyers that [plaintiff] would no longer be producing" the plaintiff's shows. *Lexton-Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 820-21 (Colo. 1992). The audience for such statements was not, of course, the entire public, but only actual or potential consumers of the defendant's product. Plaintiffs' allegations plausibly suggest a significant impact to the portion of the public seeking drug or alcohol rehabilitation services on the internet and are, therefore, adequate. *Accord Mott*, 2015 WL 1259277, at *6.

With regard to the fifth element—causation—Defendants argue that Plaintiffs only allege misrepresentations to which Charles Matthys was exposed and, therefore, that the CCPA claims by Tyler Matthys and Linda Phillips must be dismissed. The causation element is satisfied where a "sufficient nexus" between the challenged conduct and the plaintiff's injuries exists. *Crowe*, 126 P.3d at 210. Further, the injury must be of a sort that the "CCPA is intended to

protect against," such as a "consumer injury caused by a deceptive trade practice." *Id.* Applying these standards, I am satisfied that there is a sufficient nexus between the alleged misrepresentations and Linda's and Tyler's injuries, and that their injuries are of the sort the CCPA protects against. *See, e.g.*, 1st Am. Compl. ¶ 86 [Doc. # 16] (alleging "Plaintiffs have suffered damages in excess of $75,000" as a result of "Defendants' unfair or deceptive trade practices"); *id.* ¶ 19 (alleging Linda is "responsible for repayment" of a loan taken out to pay for Tyler's treatment); *id.* ¶ 41 (alleging Tyler "suffered severe emotional distress resulting from his time at Fresh Start"). The fact that Linda and Tyler were "not directly exposed to the challenged representations does not . . . foreclose upon the possibility that [they are] entitled to recover under the CCPA." *Mott*, 2015 WL 1259277, at *7.

### 6. RICO Claim Against All Defendants

Plaintiffs' response brief states that they "have opted to no longer . . . pursue their claim for Civil RICO." Resp. at 2-3 [Doc. # 36]. Defendants state in their reply brief that, as a result, I should grant their motion to dismiss as to this claim. Reply at 1 [Doc. # 44]. I will deem these statements a stipulation of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and dismiss Plaintiffs' RICO claim. *Cf. Pipeliners Local Union No. 798, Tulsa, Okl. v. Ellerd*, 503 F.2d 1193, 1197 (10th Cir. 1974) (statements made in open court constituted stipulation for dismissal).

### IV.  Conclusion

For the foregoing reasons, it is hereby **ORDERED** that:

1   ABLE and NI's Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Personal Jurisdiction [Doc. # 28] is **DENIED**;

2   ABLE and NI's Motion to Dismiss Plaintiffs' First Amended Complaint Pursuant to FRCP

12(b)(6) [Doc. # 29] is **DENIED**;

3   Defendants' Motion to Dismiss Plaintiffs['] First, Fifth, Seventh, Eighth, and Tenth Causes

of Action in Plaintiffs' First Amended Complaint [Doc. # 25] is **GRANTED IN PART AND**

**DENIED IN PART**, and Linda Phillips' contract claim and Plaintiffs' negligent infliction of

emotional distress claim are **DISMISSED**; and

4   Plaintiffs' RICO claim is **DISMISSED** upon stipulation of the parties.

DATED: May __4__, 2015, at Denver, Colorado.


BY THE COURT:


__s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE